## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| **ASHLEY MONIQUE STALLWORTH,** | ) | |
| **As Personal Representative of the** | | |
| **ESTATE OF MICHAEL ORLANDA** | ) | |
| **STALLWORTH,** | | |
| | ) | |
| **Plaintiff,** | | |
| **v.** | ) | **CIVIL ACTION 07-0439-KD-B** |
| | | |
| **SHERIFF HARRIS HUFFMAN, JR.,** | ) | |
| **et al.,** | | |
| | ) | |
| **Defendants.** | | |

## ORDER

This matter is before the Court on the motion for summary judgment filed by defendants Roger Goodman and Harris Huffman, Jr. (Doc. 135), the motion for summary judgment filed by defendants Alex King and Callaway Smith (Doc. 136), plaintiff's responses in opposition (Docs. 155, 156), and defendants' reply briefs.  (Docs. 172, 173). Also before the Court is the motion to strike deposition testimony and report of plaintiff's expert witness filed by defendants Roger Goodman, Harris Huffman, Jr., Alex King, and Callaway Smith (Doc. 176) supporting brief (Doc. 177), and plaintiff's response in opposition.  (Doc. 181).  The Court also considers all evidentiary materials offered in support of the parties' arguments.  (Docs. 137-140, 143, 154, 157, 174, 175).

## I.    FACTUAL BACKGROUND[1]

This lawsuit arises out of events that occurred on Sunday, May 27, 2007 in the

Dallas County, Alabama jail.  An altercation occurred in cell 501 between two inmates,

Mr. Corey Horton and Mr. Michael Stallworth, that resulted in the death of Mr.

Stallworth.  Mr. Stallworth's estate filed this suit against Sheriff Harris Huffman

("Huffman"), Warden Roger Goodman ("Goodman"), and two jailers who were on duty

at the time of the altercation, Officers Alex King ("King") and Callaway Smith ("Smith").

### A.    *The Dallas County Jail*

The Dallas County, Alabama jail, which has a capacity of 225 inmates, consists of

two parts: an "old" part that was built in 1971 and renovated in 2001 and a "new" part

that was built and joined to the old part in 2001.  (Doc. 138, Exhibit H at ¶ 4).  The "old"

part consists of a front office area, the jail kitchen, female and male dormitories, and eight

single cells in the hallway, one of which was inoperable in May 2007.  (Id. at ¶ 5).  The

"new" part consists of a hallway connecting the "old" part of the jail to the general

population area.  (Id. at ¶ 6).  Off this hallway of the "new" part of the jail is Cell Block

501, a reduced-population living area .  (Id. at ¶ 6).  Cell 501 is used to house inmates

with special medical or mental health concerns, such as an inmate with a violent tendency

when off specific medication, and if necessary the cell may be used to house other

inmates.  (Id. at ¶ 13; Doc. 138, Exhibit Y at 98-99).  Cell 501 contains five individual

---

[1] The facts here are construed in the light most favorable to the plaintiff.

-2-

cells and a "dayroom" with a large metal picnic table in the center and a shower in the corner.  (Doc. 138, Exhibit DD at ¶ 5).  A camera is positioned on the wall of the dayroom that allows for monitoring of only the dayroom area.  (Id. at ¶ 7).  Cell 501 is also equipped with an intercom system that allows inmates to communicate with the control room from the dayroom or the five individual cells by pushing the intercom button that causes a light to flash in the control room.  (Id. at ¶ 8).  From May 23 to May 27, 2007, Corey Horton ("Horton"), Donnie Johnson, Freddie McCampell, Jessie McMullen, and Michael Stallworth ("Stallworth") were housed in cell 501.  (Id.).

The jail has a control room that is known as the "cube."  (Doc. 138, Exhibit DD at ¶ 3).  The officer that is stationed within the cube has the following duties: observe the nine "pods" surrounding the cube that hold fifteen to sixteen inmates each, receive intercom calls from the cell areas, respond to the phone and radio calls, lock and unlock doors, respond to any emergencies, monitor the video monitoring screens, authorize telephone call requests from inmates, operate the rolling door system, and on weekends assist with the feeding of the inmates.  (Id.; Doc. 138, Exhibit N at ¶ 4).  The warden of the Dallas County Jail, defendant Roger Goodman ("Goodman"), testified that "it is neither the duty nor is it practical for the cube officer to continuously watch the camera surveillance monitors of every area of the jail."  (Doc. 138, Exhibit DD at ¶ 3).

### B.    Dallas County Jail Policy

Dallas County Jail policy is established by the sheriff with the advice and consultation of the jail warden, and the warden carries out the policies.  (Doc. 138,

Exhibit U at 41-42).  Jail policy consists of formal written policies and written or oral directives.  (Id. at 40-41; Exhibit Y at 38).  It is the jail policy to monitor all inmates in the jail's custody and to take reasonable actions to prevent and interrupt fights between inmates.  (Doc. 138, Exhibit Y at 40, 46, 50, 52; Exhibit U at 49, 230; Exhibit O at 42, 85; Exhibit P at 174-75).  According to jail policy, one officer is forbidden from entering a cell without backup if a fight is in progress.  (Doc. 138, Exhibit O at 21-22, 42-46, 85-86; Exhibit P at 172-74, 181-82).

In 2004, in an effort to prevent vandalism in the new jail, the warden issued a written policy directive requiring the cube officer to remain in the cube at all times except emergencies, especially when meals are being served.  (Doc. 157, Exhibit 4; Doc. 138, Exhibit DD at ¶ 4; Exhibit O at 79-82; Exhibit P at 84-85, 89).  After the vandalism lessened, and because weekends[2] are normally calmer and less busy in the jail, the policy was verbally modified to allow the cube officer to leave the cube on weekends to assist while the inmates were fed lunch.[3]  (Doc. 138, Exhibit DD at ¶ 4; Exhibit O at 79-82, 174-78; Exhibit P at 84-85, 89, 166-67).  Specifically, during the lunch hour the cube officer was responsible for manning the front desk while the front desk officer helped the

---

[2] Warden Goodman testified that he can adequately operate the jail on weekends with three officers, and further testimony was presented that more officers would improve the jail but would not necessarily have prevented this death.  (Doc. 138, Exhibit Y at 45-47; Exhibit HH at 404).

[3] Sheriff Huffman testified that allowing the cube officer to assist at this time provided the meals to the inmates more efficiently, and the food remained warm for the inmates.  (Doc. 138, Exhibit U at 75).

roving officer pass out the food to the inmates.  (Doc. 138, Exhibit O at 69, 71; Exhibit P

at 115).  During the time when the cube was unmonitored, the officers passed by the cells,

including cell block 501, as they walked to the front desk and on their return to hand out

food trays.  (Doc. 138, Exhibit LL at 165-67; Exhibit O at 160, Exhibit P at 206-08;

Exhibit N at ¶ ¶ 5-9).  Plaintiff has not presented any evidence that any fight, injury, or

death prior to May 27, 2007 was associated with the policy of allowing the officer to

leave the cube to assist with feeding lunch on the weekends.[4]  (Doc. 138, Exhibit O at 13-

19, 146-47; Exhibit P at 91-92, 97).

When an inmate is booked and admitted into the jail, policy calls for the jail staff

member to ask the inmate if he or she has any enemies on the jail roster and to assess for

any special medical or mental health concerns.  (Doc. 138, Exhibit O at 149-50; Exhibit P

at 32-33, 36-38, 43-44).  According to the jail medical services policy, a jail medical

officer shall conduct an initial examination on each inmate within twenty-four hours of

his or her booking and processing.  (Doc. 157, Exhibit 8).  However, the jail nurse,

Barnetha Jones ("Jones"), testified that jail policy was to examine each inmate within one

week of admittance and that the need to examine other inmates with immediate concerns

may delay this initial evaluation.  (Doc. 138, Exhibit I at ¶ 4).  The jail medical officer

also performs daily physical inspections or "walk-arounds" for each inmate and cell.

---

[4] Plaintiff presented Exhibit 10 to Doc. 157, the Dallas County Jail incident reports.
Upon review of the reports, the Court notes that in the two years prior to this incident, there were
four reported cases of inmate-on-inmate assault, only one of which had reported injuries
significant enough to require treatment.  Additionally, there is no evidence that this occurrence
that required treatment for injuries was during an unmonitored time.

(Doc. 157, Exhibit 8).  Warden Goodman stated the evaluations were usually performed on Wednesdays.  (Doc. 138, Exhibit Y at 132).

The jail classification policy requires that the following conditions are considered when placing an inmate in a cell: mental illness, age, violence level, pending medical or mental health evaluations, sex, homosexuality, and physical injury.  (Doc. 157, Exhibit 9; Doc. 138, Exhibit Y at 33-36; Exhibit U at 104-05).  Additionally, jail policy allows the segregation in cells without common areas of those with pending medical or mental health evaluations and those that have a history of violence or mental conditions.  (Doc. 138, Exhibit Y at 36, 102, 104-06; Exhibit U at 97-98, 130-32).  Warden Goodman testified that even if an individual was incarcerated at the Dallas County jail in the past, he or she is classified separately each time he or she is admitted to the jail.  (Doc. 138, Exhibit Y at 27).  The totality of the evidence at that time of the current admittance, including recent events and current behavior, are used to determine the current classification.  (Id. at 25-28; Exhibit U at 248-49).  After an inmate is classified and placed in a cell, Sergeant David Brown can review this classification decision and consult the warden and can move an inmate if he sees it as necessary.  (Doc. 138, Exhibit H at ¶ 8).

### C.    *The Arrest and Booking of Corey Horton*

Defendant Horton was arrested on April 5, 2007 pursuant to an arrest warrant related to a 2001 rape charge.  (Doc. 157, Exhibit 7).  Horton was previously arrested on

various charges including resisting arrest, trespass, giving a false name to an officer, and

breaking a bond in February 2002; contempt of court related to a domestic violence

charge in December 2002; driving under the influence in April 2003; driving without a

license in August 2003; domestic violence in the form of harassment in September 2003;

domestic violence in the form of harassment in November 2004; and contempt of court in

January 2006.  (Id.).  While an inmate in the Dallas County Jail, Horton's jail record

reflects the following incidents during the year 2003: (1) In August 2003, a jail officer

used mace on Horton after he tried to hit the officer who was taking him back to his cell;

(2) In September 2003, Horton was reported for flooding his jail cell multiple times; (3)

Also in September 2003, an officer had to use physical force to make Horton return to his

cell; and (4) In October 2003, a jail officer who was trying to place Horton back in his

cell was required to use mace on him.  (Doc. 157, Exhibit 3).  Further, during the years of

2002 and 2003, jail requested mental health evaluations were performed on Horton that

diagnosed him with suffering from general psychosis and schizo effective disorder.  (Doc.

157, Exhibit 2).[5]  According to his medical records during that period of time, Horton

displayed various bizarre and aggressive behaviors.  (Id.).

     After his arrest in April 2007, Horton was placed in cell 501.  (Doc. 138, Exhibit

L; Exhibit H at ¶ 12).  The jail doctor, Dr. Chudy Okoye, and Nurse Barnetha Jones

---

[5] There are three jail mental health consultation requests for Horton to be seen at the Cahaba Center for Mental Health.  (Doc. 157, Exhibit 2).  Horton was also treated by Hill Crest Hospital from February 19, 2002 to February 27, 2002.  (Id.).  Of note on the discharge summary from Hill Crest Hospital is that Horton displayed no "suicidal or homicidal ideations."  (Id. at 8).

performed a medical and mental health evaluation on Horton on May 16, 2007.  (Doc. 138, Exhibit L, Intake Screening Form; Exhibit I at ¶ 7; Exhibit M at ¶ 3).  Dr. Okoye did not recommend any special treatment, considerations, or medications for Horton and did not note any problems.[6]  (Doc. 138, Exhibit M at ¶ ¶ 6, 10-11; Exhibit I at ¶ 7).  Since the recorded incidents during the years 2002 and 2003, Horton presented no problems or special concerns during his 2007 incarceration and did not create problems for the jail staff.  (Doc. 138, Exhibit H at ¶ 17).  When the jail nurse, Ms. Jones, saw Horton on weekdays she did not note any unusual behavior or incidents.  (Doc. 138, Exhibit I at ¶ 8).  Horton was scheduled to have a more extensive mental health evaluation from Taylor-Hardin Mental Health Facility on May 27, 2007.  (Doc. 138, Exhibit H at ¶ 19).  Pursuant to the jail classification policy, Horton could have been segregated pending this evaluation.  (Doc. 138, Exhibit Y at 36; Doc. 157, Exhibit 9).  However, segregation may not be warranted without behavior that causes concern, and Dr. Okoye did not find that Horton needed to be isolated in an individual cell outside of cell 501.[7]  (Doc. 138, Exhibit H at ¶ 19; Exhibit M at ¶ 10).

### D.    *The Arrest and Booking of Mr. Michael Stallworth*

Amanda and Ashley Stallworth, sisters of Stallworth, and Lakeisha Murphy,

---

[6] The intake form for Horton is not signed.  (See Doc. 138, Exhibit L).  However, Dr. Okoye testified that he performed this evaluation and plaintiff presented no evidence to contradict this assertion.  (Doc. 138, Exhibit M at ¶ ¶ 3, 6, 10-11).

[7] Dr. Okoye stated that such isolation could have been detrimental to Horton's mental health.  (Doc. 138, Exhibit M at ¶ 10).

Amanda Stallworth's cousin, all spent time with Stallworth on a regular basis.  (Doc. 138, Exhibit X at 14; Exhibit C at 23-25; Exhibit T at 14-15).  These three acquaintances of Stallworth testified that he was generally docile and did not get into fights with others.  (Doc. 138, Exhibit X at 28-29; 155-58; Exhibit C at 36, 102; Exhibit T at 16, 18-19).  Stallworth was diagnosed with a paranoid condition and schizophrenia and suffered from substance abuse problems.  (Doc. 138, Exhibit W; Exhibit X at 34-36; Exhibit C at 53-60).  The parties presented testimony that when suffering from these conditions, Stallworth would become paranoid and upset "but not physically violent or abusive."  (Doc. 137 at ¶ 32; Doc. 138, Exhibit X at 35-42; Exhibit C at 36-37; Exhibit T at 72-73).  A prior injury from bullet wounds caused Stallworth occasional pain.  (Doc. 138, Exhibit V; Exhibit X at 25-28; Exhibit C at 36-38).

On the evening of May 22, 2007 and early morning of May 23, 2007, Stallworth was experiencing paranoid feelings and called his sister, Ashley Stallworth, and told her he needed help and medication because someone "was trying to kill him."  (Doc. 138, Exhibit C at 50-53, 57-59, 102-03).  Thereafter, Amanda and Ashley Stallworth made several phone calls on their cell phones to 9-1-1 and the Dallas County Jail.  (Doc. 138, Exhibit S; Exhibit X at 45, 69-72, 77-78; Exhibit C at 78).  During the early morning hours of May 23, 2007, police officers arrived followed by the arrival of an ambulance at approximately 5:04 a.m.  (Doc. 138, Exhibit D; Exhibit X at 51-54, 56, 133).  Ashley Stallworth testified, and the ambulance "call sheet" states, that the purpose of the call was to have Stallworth examined by paramedics for a "psychotic episode" where Stallworth

complained of pain and that someone was trying to kill him.  (Doc. 138, Exhibit C at 53-55, Exhibit D).  Amanda Stallworth testified that either she, Ashley Stallworth or Michael Stallworth informed emergency personnel on the scene that Stallworth had a mental condition.[8]  (Doc. 138, Exhibit X at 135-36).  Stallworth informed the emergency personnel that he needed a shot, but did not state what kind of shot.  (Id. at 58).  Paramedic Rita Tyson examined Stallworth's vital signs, although Amanda Stallworth disputes what tests were actually performed on Mr. Stallworth.  (Doc. 138, Exhibit F at ¶ 3; Exhibit X at 58-60).  The evidence is not clear as to whether anyone specifically informed Deputy Jimmy Sturdivant that Mr. Stallworth had a mental condition, or whether Deputy Sturdivant overhead this discussed with the paramedics.  (Doc. 138, Exhibit X at 148-50).  The paramedic, Rita Tyson, testified that Mr. Stallworth was physically cooperative but refused to answer questions and did not display abnormal or irrational behavior that would cause her to suspect a mental breakdown or other psychotic event.  (Doc. 138, Exhibit F at ¶ 3).  Ms. Tyson did not think that transporting Mr. Stallworth to a hospital would be necessary and after concluding her exam left the scene. (Id. at ¶ ¶ 5-7).

Following the call to 9-1-1 by Stallworth's sisters, the Sheriff's Office of Dallas County was informed that there was an outstanding warrant on Stallworth and Deputy Sheriff Jimmy Sturdivant arrived to arrest him.  (Doc. 138, Exhibit E at ¶ 3).  Deputy

---

[8] However, Amanda Stallworth testified that neither she nor her sister Ashley talked to the emergency personnel that were present.  (Doc. 138, Exhibit X at 58).

Sturdivant observed Stallworth sitting calmly on the couch and acting normally.  (Id. at ¶ 4).  Stallworth did not resist arrest and Deputy Sturdivant was able to easily take him to the jail for booking.  (Id. at ¶ 5).  Deputy Moses Suttles met Deputy Sturdivant and Stallworth at the jail, and both deputies observed that Stallworth was not acting irrationally or displaying any behaviors that were abnormal.[9]  (Id. at ¶ ¶ 5, 7; Exhibit B at ¶ ¶ 4, 6, 8).  Consequently, neither deputy gave jail staff any special instructions or warnings for Mr. Stallworth, and Deputy Suttles filled out the arrest report indicating to the jail the reason for his arrest, the fact that Stallworth cooperated and did not resist arrest, and was not injured or armed .  (Doc. 138, Exhibit B at ¶ 9; Exhibit E at ¶ 8; Exhibit A).

When previously incarcerated at the Dallas County Jail, Mr. Stallworth was housed in general population and no problems with him were reported.  (Doc. 138, Exhibit G at ¶ 6).  Upon this incarceration, Stallworth requested not to be placed in general population to avoid conflicts with possible enemies and informed jail staff that he was taking non-prescription medication for his pain.  (Id. at ¶ ¶ 9, 10, 13).  Stallworth was placed in cell 501 and did not object.[10]  (Id. at ¶ 14).  Testimony was presented from jail staff and deputies that Stallworth was normal and cooperative during the booking process

---

[9] Deputy Suttles testified that Mr. Stallworth made the comment "why haven't you guys already picked me up on this warrant, you drive past me on the street all the time."  (Doc. 138, Exhibit B at ¶ 7).

[10] During prior incarcerations at the Dallas County jail, Stallworth did not have any problems with jail staff or other inmates and was able to serve as an inmate worker in the kitchen.  (Doc. 138, Exhibit H at ¶ 20).

and initial time in jail.  (Id. at ¶ ¶ 11, 17; Exhibit B at ¶ ¶ 7-9; Exhibit E at ¶ 5-8).

Amanda Stallworth testified that she called the jail numerous times each day from May 23, 2007 to May 26, 2007 to check on Stallworth and ask for various things, such as whether he was getting his medicine, whether he would be in a single cell, and whether he could make bond.  (Doc. 138, Exhibit X at 68-73, 77-84, 86, 88-89, 92, 94-95, 97-100).  Amanda further testified that one reason she called the jail was that she was concerned that Stallworth would become paranoid and "anxious and uncomfortable" with "voices in his head."  (Id. at 137-38).[11]  Amanda testified that around noon on May 23, 2007, she spoke with Warden Goodman about whether Stallworth was receiving his medication and her request for him to be in a single cell.  (Id. at 69-72, 77-82).[12]  Amanda testified that Warden Goodman told her he would make sure Stallworth received his medication and then transferred her to speak to the jail nurse.  (Id. at 77-82).  Amanda communicated the same concerns regarding medication and housing for Stallworth to the nurse who told her

---

[11] Whether Amanda Stallworth actually communicated this subjective concern to the jail staff is disputed.  Amanda testified that she requested that Stallworth be in a cell by himself and receive his medication, but she does not state that she communicated her subjective concern that he was paranoid, heard voices in his head, and may "get into it with someone" with anyone on the jail staff.  (Doc. 138, Exhibit X at 69-74, 78).  Additionally, Amanda gave quite different testimony when she stated that she was not aware of problems or fights Stallworth encountered in previous incarcerations, did not view her brother as a violent person, was not concerned that he would get into a fight in jail, and was surprised to hear that Stallworth started the fight with Horton .  (Id. at 156-160).  Further, Amanda testified that Stallworth was not on medication in May 2007 and was no longer a mental patient.  (Id. at 73-75).

[12] However, Warden Goodman does not remember any conversation with Amanda Stallworth or any other family member prior to Stallworth's death.  (Doc. 138, Exhibit Y at 87-89).

she would make sure Stallworth received his medication and would call the Cahaba

Mental Health Center to inquire about Stallworth's condition and medication.  (Id. at 81-

82).  Amanda testified that she spoke to the nurse at least three separate times and

communicated her concerns about Stallworth's medication and housing needs.  (Id. at 80-

87, 130).  Nurse Jones then called the Cahaba Mental Health Center and booked the first

available appointment for Stallworth on Tuesday, May 29, 2007.  (Doc. 138, Exhibit I at

¶ 14; Exhibit II at ¶ 3).  The representative from Cahaba Mental Health Center did not

give Nurse Jones any special instructions or warnings as to Stallworth.  (Doc. 138,

Exhibit I at ¶ 16; Exhibit II at ¶ 5).[13]

Stallworth did not undergo a formal medical and mental health evaluation by jail

medical staff between the date of his admission on May 23, 2007 and the date of his death

on May 27, 2007.  (Doc. 138, Exhibit Y at 132, Exhibit I at ¶ 17).  Nurse Jones testified

---

[13] Stallworth's mental health therapist, Monika Lawrence, testified that Stallworth had
been off his medication for almost a year and had a history of missing therapy sessions and not
taking his medication.  (Doc. 138, Exhibit CC at ¶ 5).  However, Amanda Stallworth testified
that she witnessed Stallworth taking his medication in December, 2006, roughly six months
before his death.  (Doc. 138, Exhibit X at 75-76).  Amanda also testified that she thought her
brother was doing better and did not need more medication or medical visits.  (Id. at 22, 35-38,
72-76).  Ms. Lawrence provided therapy to Stallworth for approximately twelve years and last
saw him at Cahaba Medical Center on August 3, 2006.  (Doc. 138, Exhibit CC at ¶¶ 3, 6, 13).
Ms. Lawrence testified that she never saw evidence of violence or aggression in Stallworth
whether he was on or off his medication, and generally did not consider him violent.  (Id. at ¶¶
3, 6, 12).  Ms. Lawrence further testified that if she had been personally contacted by the jail, she
would not have given any special instructions or warnings as to Stallworth but would have
recommended that he reenter therapy.  (Id. at ¶ 12).  In her opinion, placing Stallworth in
confinement could have been detrimental when he was not presenting problems.  (Id. at ¶ 8).
    Two days before his arrest, on May 21, 2007, Stallworth was seen by Dr. Ernest Okeke
where he asked for Lortab but no other medications and his mental health was not discussed.
(Doc. 138, Exhibit J).

that she observed Stallworth in cell 501 while passing out daily medications and did not see any unusual or different behavior.  (Doc. 138, Exhibit I at ¶ 17).

### E.    The Altercation

On Thursday, May 23, 2007 and Friday, May 24, 2007, jail supervisor Sargent David Brown reviewed the classification decisions for the inmates, including those for Horton and Stallworth, and made no changes because he believed it appropriate for Horton and Stallworth to be in cell 501.  (Doc. 138, Exhibit H at ¶ 12).  Between May 23, 2007 and May 25, 2007, Brown testified that he walked down the hallway where cell 501 was located "numerous times" and saw no problems, medical, mental or otherwise.  (Id. at ¶ 21).  During this time, he testified that he did not hear any reports or concerns from the jail staff or inmates about Stallworth.  (Id.).

As the morning shift began on Sunday, May 27, 2007, Officer Callaway Smith, Officer Alex King, and Officer Tracy Sanders were on duty.  (Doc. 138, Exhibit N at ¶ ¶ 3, 4; Exhibit O at 23).  King and Smith testified that they did not have any knowledge that either Stallworth or Horton had been diagnosed with mental conditions, were dangerous, violent, or had any history of fighting with inmates.  (Doc. 138, Exhibit N at ¶ 15, Exhibit P at 92-93, 193-94, 199-200; Exhibit O at 10-13, 99-101, 158, 160-61). Officer King was the assigned cube officer and Officer Smith was assigned the role of roving jailer to maintain a presence in the new and old parts of the jail and to distribute lunch to the inmates.  (Doc. 138, Exhibit N at ¶ 5, Exhibit P at 65-66, 88, 202-05; Exhibit O at 30-31, 72-73, 75, 184-85).

Officer King testified that on May 27, 2007, right before the lunch trays were to be handed out, he left the cube to relieve Officer Sanders at the front desk, could see through the windows of cell 501, and observed no fighting or anything suspicious.  (Doc. 138, Exhibit N at ¶ 9).  Officer Smith and Officer Sanders were to transport the food tray carts from the kitchen to each inmate in the cell blocks.  (Doc. 138, Exhibit O at 30-31, 68-71, 73-78).  At 10:42 or 10:43 a.m.[14], Officer Smith went into the cube and activated the rolling door system in cell 501 and the inmates were released into the common area of cell 501 to receive their meals.  (Doc. 138, Exhibit O at 49, 73; Exhibit P at 58, 81, 87). Officer Smith was escorting inmate Zack Wilson to the showers with James Phillips and upon reaching the doorway leading to the new part of the jail, realized he did not have sufficient food trays.  (Doc. 138, Exhibit O at 76-78, 113-15).  Officer Smith decided to lock Zack Wilson in the hallway of the new part of the jail and return to the kitchen.  (Id. at 31-32, 71, 77).  During this time, when Wilson was locked in the hallway and Officer Smith and James Phillips were retrieving more food trays, the altercation between Stallworth and Horton began.  (Doc. 138, Exhibit P at 97-98).

Stallworth weighed 270 pounds with a height of 6'4" and Horton weighed 168 pounds with a height of approximately 6 feet.  (Doc. 157, Exhibit 2; Doc. 138, Exhibit AA).  Just before lunch was served and after the rolling door system was activated,

---

[14] The parties entered into a stipulation that the stamped time on the video, Exhibit Q to Doc. 138, is one hour and ten minutes slower than the actual time.  The time used is the actual time.  (See Doc. 154 at 24).  Additionally, there are gaps in time between some frames of the video that range from two to ten seconds.  (See Doc. 137 at 31 n. 15).

Stallworth walked out of his individual cell into the common area of cell 501.  (Doc. 138, Exhibit Q).  The video shows Stallworth unscrewing the top to a water cooler, pulling the cooler and top into his cell, and then coming out of his cell with the top in his hand. (Id.). A fellow inmate in cell 501, Jessie McMullen, testified that Stallworth started pacing in the common area of cell 501 with the water cooler top in his hand and "talking about everybody was after him."  (Doc. 138, Exhibit EE at 13-14).

At approximately 10:54:17 a.m., Stallworth approached the picnic table in the common area of cell 501, charged Horton with the cooler top in his hand and hit Horton in the face with the cooler top.  (Doc. 138, Exhibit Q; Exhibit EE at 18; Exhibit KK at 87).  Horton then hit Stallworth with his fist at approximately 10:54:22 and the two hit each other with their fists until Stallworth fell to the ground at approximately 10:54:45 a.m.  (Doc. 138, Exhibit Q).  During this exchange, it appears that Stallworth charged Horton who stepped aside and threw Stallworth into a door, then pulled his shirt over his head and punched his head.  (Id.).  As Horton pushed Stallworth to the floor, his head appears to hit the concrete wall by the shower.[15]  (Id.).  Horton pulled Stallworth up into a chokehold and continued to choke him as Stallworth fell to the ground.  (Id.).  The evidence varies as to whether Stallworth moved after he fell to the ground,[16] but Horton

_____

[15] However, the video is not clear and conflicting testimony was presented as to where or if Stallworth's head hit.  (See Doc. 138, Exhibit Q; Exhibit KK at 88-89, 114-16; Exhibit EE at 79).

[16] Testimony from eyewitnesses stated that Stallworth did not move while the video shows some movement of Stallworth's leg, either by Horton or Stallworth.  (Doc. 138, Exhibit KK at 91; Exhibit EE at 21, 84, 104, 115, 130-31; Exhibit Q).

got up at approximately 10:57:58 a.m. and threw the top of the water cooler onto the

ground near Stallworth and then threw the contents of a trash can on him.  (Id.).  Horton

also appears to kick Stallworth while he was on the ground and then returns to the picnic

table where he read his book.  (Id.).

During the altercation, inmate Donnie Johnson pushed the intercom button in the

common area of cell 501 that signaled the cube several times.  (See Doc. 138, Exhibit Q;

Exhibit KK at 12-15).  At 11:08:02 a.m., Officer Smith can be seen on the video opening

the door to cell 501.  (Doc. 138, Exhibit Q; Exhibit O at 115-16).  When he came to the

door, Officer Smith was told that an inmate was down and then radioed Officer King at

the front desk for assistance.  (Doc. 138, Exhibit O at 118-19).  Officer King was at the

front desk and called Officer Sanders to return so that he could go to cell 501.  (Doc. 138,

Exhibit N at ¶ 11).  At 11:09:16 a.m., Officer Smith observed Stallworth to see if he was

breathing[17].  (Doc. 138, Exhibit Q, Exhibit O at 124-25, 128, 130-31, 192).  Between

11:10:01 a.m. and 11:10:21 a.m., Officer King came into cell 501 and called the front

desk to call 9-1-1 and then walked to the front desk to ensure Officer Sanders could hear

his radio call.  (Doc. 138, Exhibit O at 129-31; Exhibit P at 110-12, 129-36, 157-60).

Officers King and Smith testified that at 11:15 they were not able to detect breathing, a

pulse, or any sign of life or movement in Stallworth, and noticed his eyes were open and

---

[17] Dr. Stephen Boudreau testified that one could miss a person's shallow breathing just by
looking for chest movement, while paramedic Kenneth DeLoach testified that he checks for
breathing by observing chest movements and listening to the person.  (Doc. 138, Exhibit MM;
Exhibit QQ).

dilated and blood was running out the side of his mouth.  (Doc. 138, Exhibit O at 90-91,

135-140; Exhibit P at 109-113; 130-132).  Officer Sanders testified that when she learned

of Stallworth's condition at the front desk, she immediately called emergency personnel.

(Doc. 138, Exhibit LL at 80-81).

A call was received by 9-1-1 at approximately 11:13 a.m. and the ambulance

arrived at the jail at 11:20 a.m. with paramedic Zack Drake.  (Doc. 138, Exhibit O at 135-

36, Deposition Exhibit 2; Exhibit R at 32-33).  Drake initiated treatment for cardiac arrest

on Stallworth but Stallworth lacked a pulse and was unresponsive at the beginning and

end of treatment.  (Doc. 138, Exhibit Z at ¶ ¶ 10, 11).  Drake then called a medical doctor

who declared Stallworth deceased.  (Id.).

On May 30, 2007, Dr. Stephen Boudreau, the State Medical Examiner for the

Department of Forensic Sciences, performed an autopsy on Stallworth.[18] (Doc. 138,

Exhibit FF at ¶ 3; Exhibit GG).

## II.  PROCEDURAL BACKGROUND

Plaintiff filed her initial complaint on June 19, 2007 as administratrix for the estate

of the deceased Michael Orlanda Stallworth against multiple defendants.  (Doc. 1 at ¶

5).[19]  Under count one, plaintiff alleges violations of the Fourth, Eighth, and Fourteenth

---

[18] The Court notes that the parties presented extensive evidence as to the cause and timing of Stallworth's death.  However, this evidence is not necessary to the Court's decision, discussed *infra*.

[19] Plaintiff agrees that Ashley Stallworth lacks standing to bring claims on behalf of herself individually and thus any such claims are DISMISSED.  Plaintiff may only bring claims on behalf of the estate of Michael Stallworth.  (See Doc. 155 at 1-2).

Amendments pursuant to 42 U.S.C. § 1983 against defendant Sheriff Huffman for allegedly failing to provide for the safety and security of inmates against jail violence, failing to properly train, manage, supervise, and instruct jail staff, and failing to enforce and operate the Dallas County Jail according to applicable policies, all in deliberate indifference to the constitutional rights of Stallworth and resulting in his death.  (Id. at ¶ ¶ 19-32).  Count two alleges that the Dallas County Commission failed to provide adequate funding to ensure the safety of Stallworth while incarcerated in the jail.  (Id. at ¶ ¶ at 33-38).  Count three alleges state assault and battery claims against defendant Horton, and count four alleges state claims for wrongful death against all defendants.  (Id. at ¶ ¶ 39-44).  Plaintiff filed her first amended complaint on December 27, 2007.  (Doc. 45).  Count five was added alleging violations of the Eighth and Fourteenth Amendments pursuant to § 1983 against defendant Warden Goodman for not taking appropriate actions to provide for the safety and security of inmates against jail violence and for failing to properly train, manage, and supervise jail staff in accordance with jail policies, all in deliberate indifference to the rights of Stallworth and resulting in his death.  (Id. at ¶ ¶ 49-61).  Count six alleges violations of the Eighth and Fourteenth Amendments pursuant to § 1983 against defendants Ernest Donaldson, Tracy Sanders, Alex King, and Callaway Smith for failing to ensure the safety of inmates and disregarding jail policies, all in deliberate indifference to the rights of Stallworth and resulting in his death.  (Id. at ¶ ¶62-66).

On November 8, 2007, the undersigned entered an order granting defendants'

Dallas County and Dallas County Commission's motion to dismiss and granting

defendant Huffman's partial motion to dismiss plaintiff's Fourth amendment claim,

substantive due process claim, wrongful death claim, and claim for injunctive relief.  (See

Doc. 32).  On April 28, 2008, the undersigned entered an order granting plaintiff's motion

to voluntarily dismiss defendants Sanders and Donaldson with prejudice.  (See Doc. 141).

Thus, the remaining defendants are (1) Sheriff Harris Huffman, Jr. ("Huffman"); (2)

Warden Roger Goodman ("Goodman"); (3) correctional or jail officer Callaway Smith

("Smith"); (4) correctional or jail officer Alex King ("King"); and (5) pro se inmate

Corey Horton ("Horton").

## III.    LEGAL STANDARD

Summary judgment should be granted only if "there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV.

P. 56(C).[20]  The party seeking summary judgment bears "the initial burden to show the

district court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608

(11th Cir. 1991).  The party seeking summary judgment always bears the "initial

---

[20]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment
shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits
> show that there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992), cert. denied, 507 U.S. 911, 113 S. Ct. 1259, 122 L. Ed. 2d 657 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute, however, will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. denied, 534 U.S. 1081, 125 S. Ct. 869, 160 L. Ed.2d 825 (2005).

## IV.   ANALYSIS

Plaintiff alleges constitutional violations against the defendants pursuant to 42 U.S.C. § 1983 ("Section 1983"). Actions brought in federal court to address and remedy

a violation of the Constitution by a state actor are enabled through Section 1983, which

provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (2008).  In order "[t]o sustain a cause of action based on section 1983,

[a plaintiff] must establish two elements: (1) that [he] suffered a deprivation of rights,

privileges or immunities secured by the Constitution and laws of the United States, and

(2) that the act or omission causing the deprivation was committed by a person acting

under color of law." Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030, 1032

(11th Cir. 1987) (internal quotations and citation omitted); Baker v. McCollan, 443 U.S.

137, 144 n.3, 99 S.Ct. 2689, 2694 61 L. Ed. 2d 433 (1979).

However, "[s]ection 1983 'is not itself a source of substantive rights,' but merely

provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v.

Oliver, 510 U.S. 266, 271, 114 S. Ct. 807, 811 (1994) (quoting Baker v. McCollan, 443

U.S. at 144).  Thus, the first step in analyzing any such claim is to identify the specific

constitutional right allegedly violated by the defendant.  Albright v. Oliver, 510 U.S. at

271.  Once the particular constitutional right is determined, the court must then apply the

standard applicable to that particular constitutional provision to determine whether a constitutional violation has actually occurred.  Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1815, 1870-71 (1989).  In addition, plaintiff must establish a causal connection between the defendant's actions, customs, policies, or statutorily imposed duties and the alleged deprivation of plaintiff's constitutional right in order to state a claim upon which relief may be granted.  Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986); Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982), cert. denied, 464 U.S. 932, 104 S. Ct. 335, 78 L. Ed. 2d 305 (1983).

In this case the defendants have plead qualified immunity.  The defense of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have know."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Thus, when defendants raise a qualified immunity defense, the court must first determine whether the defendants can establish that they were performing discretionary functions.  "[I]n order to receive qualified immunity, the public actor must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004); see also  Harris v. Coweta County, Ga, 433 F.3d 807, 811 (11th Cir. 2005).  The burden of establishing that their actions fell within the parameters of their discretionary authority rests with the defendants and their inability to

-23-

meet this burden will negate their qualified immunity defense. See Holloman ex rel. v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004).  To determine whether an individual was performing a "discretionary function" the court inquires "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  To determine whether the defendants are entitled to qualified immunity, the court must address whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  If no constitutional right was violated, then "there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.; see also Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all").  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335,

341, 106 S. Ct. 1092, 1096 (1986).

"It is well settled that '[a] prison official's deliberate indifference to a substantial

risk of serious harm to an inmate violates the Eighth Amendment."[21]  Hale v. Tallapoosa

County, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S. 825,

828, 114 S. Ct. 1970, 1974 (1994)).  Therefore, to survive summary judgment on her

section 1983 Eighth Amendment claim, plaintiff must produce sufficient evidence of "(1)

a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk;

and (3) causation."  Id.  The Eleventh Circuit has held that the deliberate indifference

prong has three components: (1) the defendant's subjective knowledge of a risk of serious

harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.

McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999); Taylor v. Adams, 221 F.3d

1254, 1258 (11th Cir. 2000) (stating that defendant must have subjective awareness of an

"objectively serious need" and that his response must constitute "an objectively

---

[21] Plaintiff bases her claims on the Eighth and Fourteenth Amendments.  Because Stallworth was a pretrial detainee and not a prisoner, his constitutional rights arise from the Due Process Clause of the Fourteenth Amendment.  Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985).  "Certainly states may not impose on pretrial detainees conditions that would violate a convicted prisoner's eighth amendment rights."  Id. at 1573-74; See also Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008) ("The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right to basic necessities that the Eighth Amendment guarantees convicted persons
. . . Pretrial detainees and other prisoners have the right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide . . . A prison official may be held liable for failing to prevent harm to a prisoner if he is deliberately indifferent to the prisoner's health or safety.") (citing Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005)).

insufficient response to that need."); <u>Cagle v. Sutherland</u>, 334 F.3d 980, 987 (11th Cir. 2003); <u>Bd. of County Comm'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed.2d 626 (1997) ("[D]eliberate indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action.").  A defendant's conduct must be more than negligence and the Supreme Court held that "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."  <u>Farmer</u>, 511 U.S. at 839-40, 114 S. Ct. at 1980.

"Deliberate indifference is not the same thing as negligence or carelessness. On the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of harm of which he is actually aware." <u>Ray v. Foltz</u>, 370 F.3d 1079, 1083 (11th Cir. 2004) (citing <u>Farmer</u>, 511 U.S. at 836, 114 S.Ct. at 1978; <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976)).  In <u>Farmer</u>, the Supreme Court expressly "reject[ed]. . .an objective test for deliberate indifference."  <u>Farmer</u>, 511 U.S. at 837, 114 S. Ct. at 1979. To be deliberately indifferent, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u>

The parties do not dispute that defendants Sheriff Huffman, Warden Goodman, Officer King, and Officer Smith were acting within their discretionary authority.  Thus,

the burden shifts to the plaintiff to provide sufficient evidence that the defendants violated a constitutional right of Stallworth, i.e. that the defendants acted with deliberate indifference to a substantial risk of harm facing Stallworth.

### A.    Sheriff Harris Huffman, Jr. and Warden Roger Goodman

Sheriff Huffman and Warden Goodman argue that they are entitled to qualified immunity for all claims brought against them by plaintiff and thus not individually liable because, among other things, plaintiff has failed to establish any constitutional violations. In response, plaintiff argues that Huffman and Goodman are not entitled to qualified immunity because they acted with deliberate indifference to Stallworth's safety and well-being because:  (1) the policy and custom regarding monitoring of inmates violated Stallworth's constitutional rights; and (2) the policy and custom regarding classification of inmates violated Stallworth's constitutional rights.[22]

For plaintiff to survive summary judgment on her section 1983 claim against Huffman, she must establish that Sheriff Huffman himself was deliberately indifferent in violation of Stallworth's constitutional rights.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115-16 (11th Cir. 2005).  The Eleventh Circuit has explained:

Thus, to succeed on her § 1983 claim, Cook must establish that the Sheriff himself,

---

[22] Dallas County Jail policy is established by the sheriff with the advice and consultation of the jail warden and the warden carries out the policies.  (Doc. 138, Exhibit U at 7, 41-42).

as representative of Monroe County, was deliberately indifferent to the possibility of Tessier's suicide, since neither respondeat superior nor vicarious liability exists under § 1983. Belcher [v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1996)]. As the Supreme Court has explained, its holding in Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed.2d 611 (1978), established that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed.2d 412 (1989) (emphasis in original). Thus, only when a "policy or custom" of the municipality inflicts the injury does § 1983 liability exist. Id. A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." Id. at 388, 109 S.Ct. 1197; see also Belcher, 30 F.3d at 1397-98.

Id.  Thus, plaintiff can establish a policy or custom that amounts to deliberate indifference by identifying either (1) an "officially promulgated county policy" or (2) "an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county."  Grech v. Clayton County, Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91, 694, 98 S. Ct. 2018 (1978)).  Additionally, the plaintiff must show that the custom or practice is the moving force behind the constitutional violation.  Id. at 1330 (citing City of Canton, 489 U.S. at 389, 109 S. Ct. 1197).

### (1)     Monitoring of Inmates

A written policy of the Dallas County Jail required the cube or control center to be manned with an officer at all times.  Huffman and Goodman have testified that this policy was motivated in part to prevent vandalism by the inmates.  As the vandalism subsided,

an oral policy or custom[23] was instituted providing that on the weekends, the officer

stationed at the cube was allowed to leave the cube to assist in the passing out of lunch

trays to the inmates.  Testimony was presented that this change was motivated in part by a

decreased level of jail activity on weekends and an interest in providing warm lunches in

an efficient manner to the inmates.  Additionally, on weekends three correctional officers

are on duty; stationed at the front desk, the cube, and a "roving" position.

Plaintiff argues that this oral policy or custom on weekends in addition to having

only three officers on duty during weekends created an unreasonable risk of danger to

Stallworth and further that defendants Huffman and Goodman were in deliberate

indifference to that risk.  Upon review of the evidence, both parties' arguments, and

Eleventh Circuit precedent, the Court finds that plaintiff has not presented sufficient

evidence that Huffman or Goodman subjectively knew that the policy or custom on

weekends created a substantial risk of serious harm to Stallworth and thus has failed to

show a violation of a constitutional right.

Several cases from this Circuit are instructive on the issue.  In Cagle v. Sutherland,

the Eleventh Circuit held that the defendant sheriff was entitled to qualified immunity

when plaintiff failed to produce sufficient evidence that his policies were deliberately

indifferent to a substantial risk of suicide in the jail.  334 F.3d 980, 988-89 (11th Cir.

---

[23] The Court notes that plaintiff and defendants spend much time arguing over the
meanings of "policy" and "custom" as they relate to this case.  Regardless of any possible
distinction, it does not affect the Court's final decision because the ultimate question is whether
the actual policy or custom violated Stallworth's constitutional rights.

2003).  The plaintiff alleged that the defendant sheriff failed to train jail officers on

suicide prevention, failed to have two employees at the jail at night, and failed to have the

cells checked every hour.  Id. at 988.  Most notably, these allegations were in violation of

a consent decree the jail was under that arose out of a voluntary settlement of a prior jail

conditions lawsuit.  Id.  The court first noted that the consent decree or order "did not

define, create or enlarge Butler's constitutional rights.  Therefore, section 1983 liability

cannot be established merely because Praytor's terms were not followed."  Id.  The court

held:

> As discussed in relation to the County's liability, no evidence existed that would
> indicate to policymakers, such as Sheriff Sutherland, that a strong likelihood of
> prisoner suicides existed in the Winston County Jail. The jail had no history of
> suicide, Praytor did not address suicide, and Sheriff Sutherland's own requests for
> more personnel were not directed at suicide. Because no evidence shows that
> Sheriff Sutherland was aware of a strong risk of suicide at the jail, his policy of
> only having one nighttime jailer cannot  be deliberately indifferent to this risk. See
> Popham [v. City of Talladega, 908 F.2d 1561, 1565 (11th Cir. 1990)].  Because
> Sheriff Sutherland did not act with deliberate indifference to a strong risk of
> suicide, he did not violate Butler's constitutional rights. Because no underlying
> constitutional violation exists, Sheriff Sutherland is entitled to summary judgment.

Id. at 988-89.  The court further held that the defendant jail officer's observation only

every fifteen minutes of an inmate that was a *known* suicide risk did not amount to

deliberate indifference.  Id. at 989-990.  The court noted that "[c]losed circuit TV

monitoring reflects concern for a prisoner's welfare and a lack of deliberate indifference.

The TV camera reached almost all of the cell.  'The fact that the camera did not pick up

every corner of the cell might be evidence of negligence, but could hardly demonstrate

deliberate indifference.'" Id. at 990 (citing Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990)); See also Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008) ("In Cagle v. Sutherland, we ruled, for example, that a jailer was not deliberately indifferent to a detainee's risk of suicide when the jailer observed the detainee every 15 minutes. . . ."); Popham, 908 F.2d at 1565 (affirming the granting of summary judgment where the facts indicated that there were no jailers on duty the night the decedent committed suicide: "Plaintiff complains of the fact that there were no guards on duty for the last shift and the failure of the camera to cover the small area of the cell in which the decedent committed suicide, but cites no cases for the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times."); Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 n. 6 (11th Cir. 1994).

In Hale v. Tallapoosa County, the Eleventh Circuit held that the jailer's failure to check for over an hour a cell where an altercation between two inmates occurred did not amount to deliberate indifference:

> The only action by Flurry that Hale argues constituted deliberate indifference to a substantial risk of serious harm was Flurry's failure to check on the bullpen between 9:30 p.m. and midnight, when his shift ended. Hale offered evidence that Flurry customarily made rounds every thirty minutes and that a jailer's failure to make rounds at brief intervals greatly increases the risk of inmate-on-inmate violence. The only portion of the two-and-a-half hours relevant to Hale's claim, however, is the first hour, as the beating occurred at approximately 10:30 pm, an hour after Flurry's last rounds. We find Hale's evidence insufficient to support the level of deliberate indifference and causal connection necessary to hold Flurry personally responsible.

50 F.3d 1579, 1582 (11th Cir. 1995).

In this case, Plaintiff presented no evidence that this policy or custom or the number of weekend officers on duty resulted in previous fights or violence between inmates that would put defendants Huffman and Goodman on notice.  Further, even if defendants Huffman and Goodman had subjective knowledge that this oral policy or custom created a risk of harm, plaintiff has failed to show that the defendants acted with deliberate indifference of Stallworth's constitutional rights.  Even accepting plaintiff's version of 26 minutes and 43 seconds when the inmates in cell block 501 were unmonitored, this period of time does not amount to deliberate indifference on the part of Huffman and Goodman.  At worst it was negligent or careless to leave cell block 501 unmonitored.  Additionally, it should be noted that testimony was presented and not disputed by plaintiff, that officers continuously walk past cell block 501 and observe it during the time period lunch is being served.  Thus, even during the lunch period when the cube is unmonitored, the inmates are periodically observed by officers.[24]

In sum, plaintiff has failed to meet her burden of providing sufficient evidence that the policies and customs for monitoring the inmates created a substantial risk of serious harm.  Further, plaintiff has not shown that either Huffman or Goodman subjectively knew or were aware that the policies created a risk of harm or acted in deliberate

---

[24] See Doc. 138, Exhibit U at 251-52 ("Yes, that's — 501 is the most observed probably in this whole jail. . . Because you have to walk by that cell, that area.  It's wide open.  There's the glass window.  You have to walk by it to get to the pod, to the get to the control room.  You have to walk by it to leave that area.  You have to walk by it to lock up other inmates, back and forth.  You have to go by it when you're feeding.  You have to go by it when you're taking up the trays.  So you're constantly walking back and forth in front of it.").

indifference to that harm.  Thus, because plaintiff has failed to show a violation of Stallworth's constitutional rights, Huffman and Goodman are entitled to qualified immunity on plaintiff's claim regarding the monitoring of inmates.[25]

### (2)     Classification of Inmates[26]

Turning to the policies and customs regarding the classification of inmates, plaintiff has stated that she "is not claiming that the policy, or lack thereof, was the cause of the constitutional deprivation as was alleged in Belcher.  Rather, Plaintiff's claims regarding medical screening are grounded in the fact that Defendants Huffman and Goodman both testified to the written policy they had put in effect at the Dallas County Jail and the fact that they blatantly violated their very own policy."  (Doc. 156 at 27-28). Specifically, plaintiff claims that the classification policy was violated because two inmates pending mental evaluation, one which was known to be paranoid, were not segregated.

---

[25] The Court notes that both plaintiff and defendants submitted expert testimony discussing whether leaving the cube unmonitored was a dangerous condition or decision.  While experts can be helpful, the ultimate question that must be addressed is whether the policy or custom violated Stallworth's constitutional rights.  See Rhodes v. Chapman, 452 U.S. 337, 348 n. 13, 101 S. Ct. 2392, 2400 n. 13 (1981) ("[Expert] opinions may be helpful and relevant with respect to some questions, but 'they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.'") (citing Bell v. Wolfish, 441 U.S. 520, 543-44 n. 27, 99 S. Ct. 1861, 1876 n. 27 (1979)).

[26] The Court notes the parties' arguments over whether plaintiff's classification claims are properly before this Court.  For the purposes of this motion for summary judgment, the Court assumes that plaintiff's claims are properly before the Court.

In order to prevail on this claim, plaintiff must present sufficient evidence that Huffman and Goodman were subjectively aware of a substantial risk of harm to Stallworth and acted in deliberate indifference to that risk when allegedly violating the classification policies and placing Stallworth and Horton in cell 501.  Regardless of whether a jail policy was violated, the ultimate question is whether the defendants acted in deliberate indifference to a known substantial risk of harm to Stallworth.  Violations of policies alone are not actionable under the constitution; a plaintiff must show a constitutional violation on the part of the defendant.  See Cagle, 334 F.3d at 986-87.

To overcome qualified immunity, plaintiff must first present sufficient evidence of a substantial risk of harm to Mr. Stallworth.  Plaintiff argues that given Horton's medical history and history of problems with jail officers in the past, placing Stallworth in cell 501 with Horton created a substantial risk of harm.  Assuming this did in fact create a substantial risk of harm, plaintiff must then show sufficient evidence that defendants Huffman and Goodman subjectively knew of the risk of harm to Mr. Stallworth.  Plaintiff argues that the defendants knew of the risk of harm because of Horton's medical records and jail history and because of his placement in cell 501.  However, no evidence was presented to show that the defendants subjectively knew of these medical and jail records. See Poiroux v. City of Citronelle, 2005 WL 2600440, at *3 (S.D. Ala. Oct. 13, 2005) (noting that plaintiff presented no evidence that the information in medical records of an inmate's suicidal mental state was conveyed to the defendant officers to make them subjectively aware of the risk).  Additionally, these records on Horton were not recent and

-34-

during his incarceration in 2007, he exhibited no mental or discipline problems.[27]

Taking it a step further, assuming defendants Huffman and Goodman possessed subjective knowledge of the substantial risk of serious harm to Stallworth, plaintiff has not presented sufficient evidence that the defendants were deliberately indifferent to that risk.  Neither Horton or Stallworth had exhibited any problems or unusual behavior during their incarceration during 2007.  Both were not placed in general population, but rather in cell 501 equipped with cameras for more extensive monitoring. Both inmates had upcoming medical evaluations and Horton was evaluated eleven days prior to the altercation.[28]  Defendants Huffman and Goodman both testified that they agreed on the classification of Horton and Stallworth in cell 501 as proper.[29]  Even taking these facts in the light most favorable to plaintiff, plaintiff has failed to show sufficient evidence of a

---

[27]Additionally, mere awareness or a general knowledge of an inmate's potential to be violent or mental conditions is not sufficient to show a subjective knowledge of a particular risk of harm to an inmate.  Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) ("During Plaintiff's time as a cellmate of Inmate Barnes, Defendants' clearly knew that Inmate Barnes was a 'problem inmate' with a well-documented history of prison disobedience and had been prone to violence. Defendants also had specific notice from Plaintiff that Inmate Barnes acted crazy, roaming his cell like a 'caged animal.' But before Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of Inmate Barnes's generally problematic nature'").

[28] See Doc. 138, Exhibit L; Exhibit M.

[29] Plaintiff argues that this agreement is in violation of jail policy regarding classification. Regardless of a violation, the classification does not amount to deliberate indifference.  Further, plaintiff mis-characterizes Goodman's testimony: Goodman testified that if it were *known* that two mentally ill and violent patients were housed in cell 501, he would isolate them.

constitutional violation on the part of defendants Huffman and Goodman.[30]


### (a)   Defendant Goodman

Plaintiff also argues that defendant Goodman violated Stallworth's constitutional rights when he failed to re-classify Stallworth based on the phone calls received from Stallworth's sister, Amanda Stallworth.  The information allegedly communicated amounted to Amanda's concern that Stallworth receive medication, be in a cell by himself, and his potential to get into disputes when paranoid.  Assuming this information created a subjective awareness in Goodman that Stallworth was at risk in cell 501, his actions did not amount to deliberate indifference.  Goodman referred Amanda to the jail nurse who in turn contacted Cahaba Medical Center, where Stallworth was previously treated.  Cahaba Medical Center gave no specific warnings or instructions for Stallworth and further, his prior medical professional, Monika Lawrence, testified that she did not consider him to be a violent person.  Additionally, no evidence shows that Goodman was

---

[30] Although not fully addressed in plaintiff's opposition, to the extent plaintiff pursues her claim of defendants' failure to train officers to properly classify inmates, she has presented no evidence that defendants Huffman and Goodman were subjectively aware of a need to train officers or that they were put on notice of any potential problems.  See Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998) (citing Wright v. Sheppard, 919 F.2d 665 (11th Cir. 1990) (sheriff's department was not liable when no evidence of prior abuse or problems put the sheriff on notice for the need for improved training)).

Also not addressed in plaintiff's opposition was whether defendants' policies as to classification of inmates, as presented in the written policies submitted and in the depositions of both Huffman and Goodman, violated the constitutional rights of Stallworth.  The court notes that the policies which provide the jail is to assess each inmate's behavior as the new period of incarceration begins to determine proper classification are not facially unconstitutional.  See e.g. Belcher, 30 F.3d at 1397; Popham, 908 F.2d at 1564-65.

subjectively aware of Horton's medical history to put him on notice of a potential danger Horton could have possessed to Stallworth.  Therefore, plaintiff has failed to present sufficient evidence to show that defendant Goodman acted with deliberate indifference in allegedly failing to re-classify Stallworth out of cell 501.


### B.     Officer Alex King

Defendants argue that Officer King is entitled to qualified immunity because plaintiff has failed to state a constitutional violation on the part of King.  Plaintiff argues that defendant King violated Stallworth's constitutional rights by following the policy or custom and leaving his position at the cube to assist in the serving of lunch to the inmates. As discussed, the Court has found that while this policy or custom could arguably be negligent, it does not arise to the level of deliberate indifference.  Thus, the mere following of the custom by defendant King does not establish a constitutional violation.

Further, regardless of King's following of the policy or custom, his actions considered alone do not arise to the level of deliberate indifference.  As discussed *supra*, in order to establish deliberate indifference and thus the violation of a constitutional right on the part of Officer King, plaintiff must prove that he had a subjective knowledge of a risk of serious harm to Stallworth.  Plaintiff has presented no evidence that Officer King had subjective knowledge of the mental history or conditions of either Stallworth or Horton.  Since being incarcerated in cell 501, neither inmate had caused problems or shown any evidence of violence.  The mere fact that Horton and Stallworth were in cell

501 is not enough to show subjective knowledge of a substantial risk of serious harm. See Farmer, 511 U.S. at 838, 114 S. Ct. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not. . .cannot under our cases be condemned as the infliction of punishment.").  Even if Officer King had subjective knowledge of the risk of serious harm to Stallworth in cell 501, plaintiff presented no evidence to show that he disregarded that risk with deliberate indifference.

Additionally, plaintiff pleads in her first amended complaint a failure to provide medical care on the part of defendant King.  (Doc. 45 at ¶ 63).  If plaintiff is claiming a failure to bring medical personnel quick enough for Stallworth or a failure to administer medical procedures himself, she has shown no evidence of a constitutional violation.  The evidence shows that as soon as defendant King was aware of Stallworth's condition, he called the front desk to call 9-1-1 and along with Officer Smith checked to see if Stallworth was breathing.

Plaintiff also appears to argue that defendant King should have known of Stallworth's condition earlier and provided medical care.  However, plaintiff is attempting to rely on an argument of causation before showing a constitutional violation, i.e. deliberate indifference, on the part of King.

### C.       *Officer Callaway Smith*

Plaintiff agrees that defendant Smith's motion for summary judgment is due to be granted and thus, the motion for summary judgment as it relates to Officer Callaway

-38-

Smith is **GRANTED**.  (See Doc. 155 at 1-2).


### D.    *State Law Claims*

The plaintiff's only remaining claims are state law claims against the various

defendants.[31]  Although this Court has supplemental jurisdiction over these claims, the

Court finds that these claims are best resolved in state court and declines to exercise

supplemental jurisdiction in this instance.[32]  Shotz v. City of Plantation, Fla., 344 F.3d

1161, 1185 (11th Cir. 2003) ("[D]istrict courts can decline to exercise [supplemental]

jurisdiction ... for a number of valid reasons. Accordingly, ... 'district courts [should] deal

with cases involving pendent claims in the manner that best serves the principles of

economy, convenience, fairness, and comity ....' ") (internal citations omitted); 28 U.S.C.

§ 1367(a), (d) (2008).  Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), all remaining

state law based claims are due to be DISMISSED without prejudice.[33]

---

[31] Plaintiff's Amended Complaint invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

[32] 28 U.S.C. § 1367(c)(1)-(4) identifies the following four scenarios under which a district court may decline supplemental jurisdiction: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(4) (2008).

[33] The parties are reminded of 28 U.S.C. § 1367(d) which provides that "[t]he period of limitations for any claim asserted under subsection [28 U.S.C. § 1367(a)], and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection [28 U.S.C. § 1367(a)], shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

**IV.    Conclusion**

For all of the reasons discussed herein, the defendants' Motions for Summary

Judgment (Docs. 135, 136) are due to be **GRANTED**.[34]

Additionally, this Court declines supplemental jurisdiction over the remaining state

law claims.  All remaining state law claims are DISMISSED without prejudice.

**DONE** and **ORDERED** this the 22nd day of July, 2008.


                                   S/ Kristi K. DuBose
                                   **KRISTI K. DuBOSE**
                                   **UNITED STATES DISTRICT JUDGE**


_____

[34] Defendant's Motion to Strike deposition testimony and report of plaintiff's expert witness (Doc. 176) is **MOOT**.